**UNITED STATES of America,
Plaintiff,**

v.

**F/V TAIYO MARU, NUMBER 28, SOI 600, and her Tackle, Apparel, Furniture, Appurtenances, Cargo and Stores, Defendant.**

**UNITED STATES of America**

v.

**Masatoshi KAWAGUCHI**

**Civ. No. 74–101 SD, Cr. No. 74–46 SD.**

United States District Court,
D. Maine, S. D.

June 17, 1975.

---

Peter Mills, U. S. Atty., John B. Wlodkowski, Asst. U. S. Atty., Portland, Me., Edward F. Bradley, Jr., Land & Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., Charles E. Kuenlen, National Marine Fisheries Service, U. S. Dept. of Commerce, Gloucester, Mass., for plaintiff.

Fred C. Scribner, Jr., Portland, Me., Peter J. Gartland, Wender, Murase & White, New York City, for defendant.

## OPINION AND ORDER
## OF THE COURT

GIGNOUX, District Judge.

These two proceedings arise from the seizure of a Japanese fishing vessel, the F/V TAIYO MARU 28, by the United States Coast Guard for violation of United States fisheries law. On September 5, 1974, the Coast Guard sighted the TAIYO MARU 28 fishing at Latitude 43–35.9 North, Longitude 69–20 West. That point is approximately 16.25 miles off the coast of the State of Maine and approximately 10.5 miles seaward from Monhegan Island. It is conceded to be within the contiguous fisheries zone of the United States. 16 U.S.C. § 1092. The Coast Guard signaled the TAIYO MARU 28 to stop, but the vessel attempted to escape by accelerating toward the high seas. The Coast Guard immediately pursued and seized the vessel on the high seas at Latitude 42–58 North, Longitude 68–24 West, a point approximately 67.9 miles at sea from the mainland of the continental United States. The vessel was thereafter delivered to the port of Portland,

and on September 6, 1974, the United States filed in this Court a civil complaint for condemnation and forfeiture of the vessel and a criminal information against the master, Masatoshi Kawaguchi. Both actions charge violations of 16 U.S.C. §§ 1081 and 1091 and seek imposition of the sanctions for such violations provided by 16 U.S.C. § 1082.[1] On October 4, 1974, Miho Maguro Gyogyo Kabushiki Kaisha of Shimizi, Japan, a corporation, as the sole owner and party entitled to possesion of the TAIYO MARU 28, appeared through local counsel and filed its demand for restitution and right to defend, and an answer to the complaint, in the forfeiture action.[2] On October 18, 1974, the master was arraigned and pleaded not guilty to the criminal information.[3]

Presently before the Court are identical motions for dismissal of the complaint and information filed by the claimant in the forfeiture action and the master in the criminal action (hereinafter collectively referred to as defendant). Defendant seeks dismissal of all proceedings on the ground that the Court lacks jurisdiction, since the vessel, unlawfully, was seized on the high seas in violation of the territorial limitations imposed by international agreements on the power of the United States to pursue and seize foreign vessels and arrest foreign nationals for violation of its domestic fisheries law. The issue thus presented is before the Court on the basis of the pleadings, supplemental stipulations, and the written and oral arguments of counsel.[4]

For the reasons to be stated, defendant's motions to dismiss for lack of jurisdiction are denied.

*I*

### Summary of Facts and Contentions of the Parties

There is no dispute as to the events, recited above, which led to the seizure of the TAIYO MARU 28. For the purposes of the instant motions, the following undisputed facts are significant: (1) On September 5, 1974, the United States Coast Guard sighted the TAIYO MARU 28, a commercial Japanese fishing vessel, within waters which the United States claims as part of its contiguous fisheries zone, and had reasonable cause to believe that the vessel was fishing in the zone in violation of United States fisheries law; and (2) at that point, the Coast Guard signaled the TAIYO MARU 28 and, after giving immediate and continuous hot pursuit, effected seizure of the vessel on the high seas.

The United States contends that, by fishing in the contiguous fisheries zone, the TAIYO MARU 28 and her captain violated the Bartlett Act, 16 U.S.C. § 1081 et seq., and the Contiguous Fisheries Zone Act, 16 U.S.C. § 1091 et seq., and that international law permits, and United States law authorizes, the hot pursuit of a foreign vessel from the contiguous fisheries zone and the seizure of the vessel on the high seas for violation of domestic fisheries law. Defendant's position is that this Court lacks jurisdiction over the TAIYO MARU 28 and her master, because the vessel was seized on the high seas in violation of the 1958 Geneva Convention on the High Seas, *opened for signature* April 29, 1958, 13 U.S.T. 2312 (entered into force September 20, 1962), a multi-

---

1. Jurisdiction of the civil action is predicated on 28 U.S.C. §§ 1331, 1345 and 1355; jurisdiction of the criminal action is based on 18 U.S.C. § 3231.

2. On October 24, 1974, claimant filed an amended demand for restitution, noting a restricted appearance under Fed.R.Civ.P.Supp. Rule E(8).

3. The vessel, its captain, and the crew have since been released upon posting a bond con-

ditioned upon the payment of any penalty or fine which might be imposed in these proceedings.

4. Counsel agree that defendant's alternative motions to dismiss for failure to state a claim upon which relief can be granted and for failure to state an offense against the United States present disputed factual questions and are not ripe for determination at this time.

lateral treaty agreement to which both Japan and the United States are parties signatory.

## II

### The Statutes Involved

By the Bartlett Act, enacted in 1964, Congress made it unlawful for any foreign vessel, or for the master of such a vessel, to engage in fishing within the territorial waters of the United States, or "within any waters in which the United States has the same rights in respect to fisheries as it has in its territorial waters . . . except . . . as expressly provided by an international agreement to which the United States is a party." 16 U.S.C. § 1081.[5] The Bartlett Act established criminal penalties for violators and provided for the seizure and forfeiture of any vessel and its catch found in violation. 16 U.S.C. § 1082.[6] In enacting the Bartlett Act, the intent of Congress was to fill a gap in existing law by making it clear that foreign vessels are denied the privilege of fishing within the territorial waters of the United States and by providing effective sanctions for unlawful fishing by foreign vessels within territorial waters. H.R.Rep. (Merchant Marine and Fisheries Committee) No. 1356 (1964),

U.S.Cong. & Admin.News, 1964, pp. 2183, 2183–84. The Bartlett Act did not define the width of the territorial sea, "thereby leaving the opportunity for the United States to follow the lead of Canada and other nations in establishing a limit beyond the present 3 miles for fishery purposes." *Id.* at p. 2187. The words "within any waters in which the United States has the same rights in respect to fisheries as it has in its territorial waters" were added in anticipation of the United States extending its fishery jurisdiction out to 12 miles. *See* H.R.Rep. (Merchant Marine and Fisheries Committee) No. 2086 (1966), U.S.Cong. & Admin.News, 1966, pp. 3282, 3289.

By the Contiguous Fisheries Zone Act, enacted in 1966, Congress established a fisheries zone contiguous to the territorial waters of the United States and provided with respect to such zone:

> The United States will exercise the same exclusive rights in respect to fisheries in the zone as it has in its territorial sea, subject to the continuation of traditional fishing by foreign states within this zone as may be recognized by the United States. 16 U. S.C. § 1091.[7]

5. 16 U.S.C. § 1081 provides in relevant part:
    It is unlawful for any vessel, except a vessel of the United States, or for any master or other person in charge of such a vessel, to engage in the fisheries within the territorial waters of the United States, . . . or within any waters in which the United States has the same rights in respect to fisheries as it has in its territorial waters or in such waters to engage in activities in support of a foreign fishery fleet or to engage in the taking of any Continental Shelf fishery resource which appertains to the United States except as provided in this chapter or as expressly provided by an international agreement to which the United States is a party. * * *

6. 16 U.S.C. § 1082(a) and (b) provide:
    (a) Any person violating the provisions of this chapter shall be fined not more than $100,000, or imprisoned not more than one year, or both.
    (b) Every vessel employed in any manner in connection with a violation of this chap-

ter including its tackle, apparel, furniture, appurtenances, cargo, and stores shall be subject to forefeiture and all fish taken or retained in violation of this chapter or the monetary value thereof shall be forfeited. For the purposes of this chapter, it shall be a rebuttable presumption that all fish found aboard a vessel seized in connection with such violation of this chapter were taken or retained in violation of this chapter.
16 U.S.C. § 1082(c) makes applicable to such seizures and forfeitures the existing law relating to seizure, forfeiture and condemnation of a vessel for violations of the customs laws, except when inconsistent with the provisions of the Act.

7. 16 U.S.C. § 1091 reads in full:
    There is established a fisheries zone contiguous to the territorial sea of the United States. The United States will exercise the same exclusive rights in respect to fisheries in the zone as it has in its territorial sea, subject to the continuation

The contiguous fisheries zone was defined by Congress in the Contiguous Fisheries Zone Act as having "as its inner boundary the outer limits of the territorial sea and as its seaward boundary a line drawn so that each point on the line is nine nautical miles from the nearest point in the inner boundary." 16 U.S.C. § 1092.[8] In so defining the contiguous zone, Congress recognized that the territorial sea of the United States extends three miles from the United States, which is where Thomas Jefferson set the outer limit in 1793 and where "it has remained unaltered to this day." H.R.Rep.No.2086, *supra* at pp. 3284–85. *See* Cunard Steamship Co. v. Mellon, 262 U.S. 100, 122–23, 43 S.Ct. 504, 167 L.Ed. 894 (1923).[9] It was the expressed intent of Congress in the 1966 legislation to "unilaterally establish a fishery zone contiguous to the present 3-mile territorial sea of the United States by extending our exclusive fisheries rights to a distance of 12 miles from our shores." H.R.Rep.No.2086, *supra* at p. 3285.

### III

### *The Right of Hot Pursuit From the Contiguous Fisheries Zone*

Defendant makes no contention that the contiguous fisheries zone created by the United States in the Contiguous Fisheries Zone Act violates customary international law. Defendant also recognizes that, within the three-mile territorial sea, the United States has the right to prohibit foreign fishing and that Article 23 of the Convention on the High Seas provides express authority for the United States to conduct hot pursuit from the territorial sea onto the high seas for the purpose of apprehending foreign ships which have violated domestic fisheries law within the territorial sea. And defendant does not contest that the Contiguous Fisheries Zone Act extended to a zone nine miles from the seaward limit of the territorial sea all the rights with respect to fisheries which the United States previously had in its territorial sea, and that, unless restricted by treaty, the United States has the right to conduct hot pursuit from a contiguous zone onto the high seas for violations of its domestic law. *See* The Newton Bay, 36 F.2d 729, 731–32 (2d Cir. 1929); Gillam v. United States, 27 F.2d 296, 299–300 (4th Cir.), cert. denied, 278 U.S. 635, 49 S.Ct. 32, 73 L.Ed. 552 (1928); The Resolution, 30 F.2d 534, 537 (E.D.La.1929); The Pescawha, 45 F.2d 221, 222 (D.Ore.1928); The Vinces, 20 F.2d 164, 172–73 (E.D.S.C. 1927). Defendant's sole contention is that the United States had no right to conduct hot pursuit from the contiguous zone and to effect seizure of the TAIYO MARU 28, because the vessel was seized on the high seas in violation of Article 23 of the 1958 Convention on the High Seas.

The Convention on the High Seas provides, in Article 2, that:

> The high seas being open to all nations, no State may validly purport to subject any part of them to its sovereignty. Freedom of the high seas . . . comprises, *inter alia*, both for coastal and non-coastal States:
>
> . . . . . .
>
> (2) Freedom of fishing; . . .

Article 5 of the Convention vests "exclusive jurisdiction" in each signatory over its vessels "on the high seas." Article 23 of the Convention, however, recognizes certain instances in which a State

---

of traditional fishing by foreign states within this zone as may be recognized by the United States.

8. 16 U.S.C. § 1092 reads in full:
 The fisheries zone has as its inner boundary the outer limits of the territorial sea and as its seaward boundary a line drawn so that each point on the line is nine nautical miles from the nearest point in the inner boundary.

9. It is not disputed that the territorial sea extends a distance of three miles around Monhegan Island, as well as from the coastline of the mainland. *See* Convention on the Territorial Sea and the Contiguous Zone, *infra*, Art. 10(2).

may seize a foreign vessel on the high seas, based on hot pursuit:

> The hot pursuit of a foreign ship may be undertaken when the competent authorities of the coastal State have good reason to believe that the ship has violated the laws and regulations of that State. Such pursuit must be commenced when the foreign ship or one of its boats is within the internal waters or the territorial sea or the contiguous zone of the pursuing State, and may only be continued outside the territorial sea or the contiguous zone if the pursuit has not been interrupted. . . . If the foreign ship is within a contiguous zone, as defined in article 24 of the Convention on the Territorial Sea and the Contiguous Zone, the pursuit may only be undertaken if there has been a violation of the rights for the protection of which the zone was established.

Article 24 of the Convention on the Territorial Sea and the Contiguous Zone, *opened for signature* April 29, 1958, 15 U.S.T. 1607 (entered into force September 10, 1964), contains the following pertinent provisions:

> 1. In a zone of the high seas contiguous to its territorial sea, the coastal State may exercise the control necessary to:

>> (a) Prevent infringement of its customs, fiscal, immigration or sanitary regulations within its territory or territorial sea;

>> (b) Punish infringement of the above regulations committed within its territory or territorial sea.

> 2. The contiguous zone may not extend beyond twelve miles from the baseline from which the breadth of the territorial sea is measured.

Defendant asserts that Article 23 of the Convention on the High Seas must be read in conjunction with Article 24 of the Convention on the Territorial Sea and the Contiguous Zone. The argument is that since Article 24 only authorizes the establishment of a contiguous zone for the purposes of enforcing the coastal State's customs, fiscal, immigration or sanitary regulations, and since Article 23 permits hot pursuit of a foreign ship from such a contiguous zone only for the four purposes listed in Article 24, the United States was without authority to commence hot pursuit of the TAIYO MARU 28 from within the contiguous fisheries zone for the purpose of enforcing its fisheries regulations.

■ Both parties recognize that the general rule of law is that the power of the government to enforce a forfeiture or to prosecute a defendant is not impaired by the illegality of the method by which it has acquired control over the property or the defendant. Dodge v. United States, 272 U.S. 530, 532, 47 S.Ct. 191, 71 L.Ed. 392 (1926); The Caledonian, 17 U.S. 100, 4 Wheat. 100, 103, 4 L.Ed. 523 (1819); The Richmond, 13 U.S. 102, 9 Cranch. 102, 3 L.Ed. 670 (1815) (unlawful seizure of property); Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952); Ker v. Illinois, 119 U.S. 436, 444, 7 S.Ct. 225, 30 L.Ed. 421 (1886); Lujan v. Gengler, 510 F.2d 62, 65–68 (2d Cir. 1975); *but cf.* United States v. Toscanino, 500 F.2d 267, 271–79 (2d Cir. 1974) (unlawful apprehension of defendant). Defendant relies upon the exception to this general rule established in Cook v. United States, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933). In *Cook*, the United States Coast Guard seized a British vessel, the *Mazel Tov*, caught in rum-running, on the high seas outside the American jurisdictional limits set by a British-American treaty covering the apprehension of prohibition law violators.[10] The Su-

---

10. The *Mazel Tov* was seized more than one hour's sail from the United States coastline. By prior treaty with Great Britain, the United States had limited its customs jurisdiction over British vessels to offenses which were discovered within one hour's sail from the coast.

preme Court held that the United States "lacking power to seize, lacked power, because of the Treaty, to subject the vessel to our laws. To hold that adjudication may follow a wrongful seizure would go far to nullify the purpose and effect of the Treaty." *Id.* at 121–22, 53 S.Ct. at 312. *See also* The Golmaccan, 8 F.Supp. 338 (D.Me.1934); The Which One, 2 F.Supp. 890 (E.D. N.Y.1933); United States v. Ferris, 19 F.2d 925 (N.D.Cal.1927) (seizure of vessel); Ford v. United States, 273 U.S. 593, 605–06, 47 S.Ct. 531, 71 L. Ed. 793 (1927); United States v. Rauscher, 119 U.S. 407, 430–32, 7 S.Ct. 234, 30 L.Ed. 425 (1886); United States v. Toscanino, *supra*, 500 F.2d at 278–79 (apprehension of defendant). Mr. Justice Brandeis made clear, however, that the exception to the general rule recognized in *Cook* covers the particular situation where the United States has by treaty "imposed a territorial limitation upon its own authority." Cook v. United States, *supra*, 288 U.S. at 121, 53 S.Ct. at 312. As stated in Autry v. Wiley, 440 F.2d 799 (1st Cir. 1971), the *Cook* doctrine is a "narrow" exception to the general rule; it "applies only to violations of a specific territorial jurisdictional circumscription set by treaty." *Id.* at 802.

■ Defendant strenuously argues that the *Cook* exception destroys the jurisdiction of this Court in these proceedings because by Article 23 of the Convention on the High Seas, read together with Article 24 of the Convention of the Territorial Sea and the Contiguous Zone, the United States has undertaken a specific obligation not to institute hot pursuit of a foreign ship from the contiguous fisheries zone for violation of its fisheries law. Defendant's position is that Article 23 limits the government's right of hot pursuit from a contiguous zone to the four purposes for which Article 24 authorizes the establishment of such a zone, and the enforcement of domestic fisheries

law is not one of the purposes recognized by Article 24. The Court is persuaded, however, that neither the language nor the history of the Conventions shows that the signatory parties intended to limit the right of a coastal State to exercise exclusive fishery jurisdiction within 12 miles of its coast, to establish a contiguous zone for such a purpose, or to conduct hot pursuit from such a zone.

Analysis of the text of Article 23 of the Convention on the High Seas shows that the Article provides general authority to undertake hot pursuit from a contiguous zone when the authorities of the coastal State have good reason to believe that a foreign vessel has violated the coastal State's laws and regulations. It is true that Article 23 permits hot pursuit from a contiguous zone, created for one of the four purposes enumerated in Article 24 of the Convention on the Territorial Sea and the Contiguous Zone, only if there has been a violation of the rights for the protection of which the zone was established. But Article 23 does not in terms deny a coastal State the right to commence hot pursuit from a contiguous zone established for a purpose other than one of the purposes listed in Article 24. Nor does Article 24 in terms prohibit the establishment of a contiguous zone for a purpose other than one of those specified in the Article. The language of Article 24, relating to the purposes for which a contiguous zone may be established, is permissive, rather than restrictive. It provides that a coastal State "may" establish a contiguous zone for the purposes of enforcing its customs, fiscal, immigration or sanitary regulations. Although Article 24 only affirmatively recognizes the right of a coastal State to create a contiguous zone for one of the four enumerated purposes, nothing in the Article precludes the establishment of such a zone for other purposes, including the enforcement of domestic fisheries law. In short, unlike the British-

American treaty in *Cook*,[11] the Conventions in the case at bar contain no specific undertaking by the United States not to conduct hot pursuit from a contiguous fisheries zone extending 12 miles from its coast. The *Cook* exception, therefore, is not applicable, because the United States has not by treaty "imposed a territorial limitation upon its own authority."

The history of the 1958 Conventions confirms the conclusion that the United States did not specifically undertake to limit its authority to exercise exclusive fisheries jurisdiction within 12 miles of its coast, to establish a contiguous zone for such a purpose, or to conduct hot pursuit from such a zone. The Convention on the High Seas and the Convention on the Territorial Sea and the Contiguous Zone were the product of the Conference on the Law of the Sea, convened at Geneva in 1958 pursuant to Resolution 1105 of the General Assembly of the United Nations. U.N. General Assembly, 11th Sess., Official Records, Supp. No. 17 (A/3572). Although the Conference was convened to resolve a variety of matters pertaining to the codification of the Law of the Sea, most commentators agree that the two principal issues presented for the Conference's consideration were the question of the breadth of the territorial sea, and the closely-related question of whether there should be an additional contiguous zone in which the coastal States could exercise exclusive jurisdiction over fishing. *See, e. g.*, McDougal and Burke, The Public Order of the Oceans, 524–48 (1st ed. 1962); Fitzmaurice, Some Results of the Geneva Conference on the Law of the Sea, 8 International and Comparative Law Quarterly 73, 73–75 (1959); Dean, The Geneva Conference on the Law of the Sea: What Was Accomplished, 52 The American Journal of International Law 607, 607–08 (1958). *See also* Hearings on the Conventions on the Law of the Sea, Executives J, K, L, M, N, before the Committee on Foreign Relations, United States Senate, 86th Cong. 2nd Sess., p. 4 (January 20, 1960). The 1958 Geneva Conference was unable to achieve agreement on either issue, primarily because of the volatile political ramifications involved in setting a limit to the territorial sea.[12] In recommending that the Senate give its advice and consent to ratification of the Conventions, the Senate Report from the Committee on Foreign Relations made clear that the Convention on the Territorial

---

11. *See* note 10, *supra*.

12. The position of the United States at the Conference was that the territorial sea should be defined as narrowly as possible, preferably at the three-mile limit which it had traditionally recognized. In advocating this position, a major concern of the United States was to avoid undue limitation of its right to fish off the coasts of other nations. In this position, it was supported primarily by the maritime nations, which had traditionally engaged in fishing off foreign shores. Opposition to the American position was centered principally in the Soviet bloc countries and the newly-emerging and underdeveloped countries. When it became apparent that any proposal for a three-mile territorial sea would fail to attract the two-thirds vote necessary for adoption, the United States sponsored a compromise proposal which called for a six-mile territorial sea and a further six-mile contiguous fisheries zone. This proposal barely failed of passage, and since no other pro-

posal was able to attract a two-thirds vote, the final Conventions do not define the breadth of the territorial sea, or the extent to which a coastal State may assert exclusive fisheries jurisdiction. *See generally* Dean, *supra* at 613–16; McDougal and Burke, *supra* at 529–48; Hearings, *supra* at 4–9, 21–22.

When the Law of the Sea Conference was reconvened at Geneva in 1960, the participants again were unable to agree on the width of the territorial sea or the extent to which a coastal State could exercise exclusive fishing jurisdiction in the waters off its coast. *See generally* Dean, Second Geneva Conference on the Law of the Sea: The Fight for Freedom of the Seas, 54 Am.J. Int'l L. 751, 779–81 (1960). A joint American-Canadian compromise proposal, in most respects similar to that made by the United States at the 1958 Conference, failed of passage by one vote. *See* McDougal and Burke, *supra* at 547.

Sea and the Contiguous Zone did not define the width of the territorial sea, or circumscribe the right of a coastal State to assert exclusive fisheries jurisdiction:

> This convention does not fix the breadth of the territorial sea. This subject and the closely related one of the extent to which the coastal state should have exclusive fishing rights in the sea off its coast were hotly debated without any conclusion being reached. Exec. Rept. No. 5, Law of the Sea Conventions, to accompany Ex. J to N, inclusive, 86th Cong. 1st Sess., p. 4 (1960).

It is clear from the foregoing history that, in becoming a signatory to the 1958 Conventions, the United States could not have intended to accept any limitation on its right to conduct hot pursuit for violations of exclusive fishery rights occurring within 12 miles of its coast, since the Geneva Conference could not agree as to whether a contiguous zone could be established for the purpose of enforcing domestic fisheries law.

It is apparent that Congress was well aware of its obligations under the 1958 Conventions when the 1966 Contiguous Fisheries Zone Act was enacted, and that Congress perceived no conflict between the Act and the treaty provisions. This is evident from the House Report, which discusses the Conventions and their relationship to the proposed legislation:

> In 1958, and again in 1960, the Law of the Sea Conferences held in Geneva, Switzerland, left unresolved the twin questions of the width of the territorial sea and to the extent to which a coastal state could claim exclusive fishing rights in the high seas off its coast. At the second conference in 1960, the United States and Canada put forward a compromise proposal for a 6-mile territorial sea, plus a 6-mile exclusive fisheries zone (12 miles of exclusive jurisdiction in all) subject to the continuation for 10 years of traditional fishing by other states in the outer 6 miles. This compromise proposal failed by one vote to obtain the two-thirds vote necessary for adoption.

> Since the 1958 Law of the Sea Conference, there has been a trend toward the establishment of a 12-mile fisheries rule in international practice. Thirty-nine countries acting individually or in concert with other countries have extended their fisheries limits to 12 miles since 1958. H.R.Rep. No. 2086, *supra* at p. 3286.

The Report also notes that, as of July 1, 1966, of the 99 United Nations coastal nations, slightly more than 60 countries asserted a 12-mile exclusive fishery zone, either as territorial sea or as territorial sea plus a contiguous zone. *Idem.*[13]

## IV

### Order

█ Since the seizure of the TAIYO MARU 28 on the high seas following hot pursuit from the contiguous zone was not in violation of Article 23 of the 1958 Convention on the High Seas, and, moreover, was sanctioned by domestic law and in conformity with the prevailing consensus of international law and practice, this Court has jurisdiction to decide the present proceedings on their merits. Defendant's motions to dismiss for lack of jurisdiction are therefore denied.

It is so ordered.

---

13. In this connection, it should also be noted that the Convention on the Territorial Sea and the Contiguous Zone does not define the breadth of the territorial sea. *See* Arts. 1, 3 and 6. Thus, nothing in the language of the Convention precludes the United States from claiming a territorial sea of 12 miles, in which it could exercise exclusive fishing rights.